All rise. The Illinois Appellate Court Third Division is now in session. The Honorable Justice Barney Gordon is presiding. Everyone can be seated. Good morning, Mr. Kleptovich. And would you call the case, please? Okay, would the lawyers who are going to argue the case please introduce yourselves to the court? Sure. May I remove my mask? Yeah, you can remove your mask. Good morning, Your Honors. Robert Robertson on behalf of Mr. Paschal. Good morning. Assistant State's Attorney Whitney Bond on behalf of the people. And appellate, how much time would you like for rebuttal? Judge, ten minutes, five, ten minutes. Well, you know, I only get 15 minutes to begin with, so I mean, how much time do you want? I'll take five minutes. Five minutes, okay. All right, let's proceed. And Judge, my back has been acting up. I think I'm going to be able to make it through, but if not, I may ask the court to sit down at some point. Okay. May it please the court, I'm here on behalf of Mr. Paschal to ask this court to take the admittedly unusual step of reversing a murder conviction. This case presents, really, I think what I refer to as a recipe for potential for a wrongful conviction. You have here a truly innocent victim, tragic, tragic circumstances. This kid was in the middle of Englewood, doing everything right in his life, going to college. Are you telling us this defendant wasn't there? Judge? Yes, I am. Flat out, yes. And I think, I mean, I don't want to dance on the head of the pin between he wasn't there and the evidence doesn't prove he was there, but he was not there. If you look at it, Judge, this was a, Justice, I'm so sorry, this was a single-finger case. A single-finger case with scant, if any, corroboration. Now, I know a single-finger case can support a conviction. What about the phone? That's the only potential corroboration. Right. You look at it with Kawani Williams. I mean, there's a person who ducked the detectives, only came up with that statement seven or eight or nine times after they had said it. It wasn't, are we, is there a question that he had that phone? The defendant? Yeah. Yeah, I think there is a question. I know Kawani Williams said that. Okay. But Kawani Williams said that while he was in custody, facing a weapon, facing a charge, he was hoping to get helped out. He ducked the detective six, seven times, and then he comes up with that. Okay. But that's the only corroboration. And, you know, you look at how William Pascal wound up in this case. It was from the information provided by Antonio Johnson. That's the only way he wound up in that photo array. That information from Antonio Johnson was he was in custody, he was facing a weapons offense, he was trying to give something up. He comes up with a story that's an admitted lie, admitted lie, saying three people, three, not two, were involved in this. And it occurred at 67th and Campbell, over half a mile away from this would occur. No date. Do detectives corroborate anything on this? No. They don't. Their investigation ceases, and they decide to focus on William Pascal based on this statement. He winds up. You know, here you have a, you know, you have an eyewitness. Judge, and this witness was a very good eyewitness. She was a communications major, a college student, a victim, the victim's cousin. She was a powerful witness for the jury. That's exactly why her testimony carried undue weight. If you look at what's here, the testimony that she gave, there's serious considerations as to whether that testimony was accurate or not. You know, one, she gets a sequence of events. Wrong. Different. You know, she comes up in court and says, hey, these guys were out of the van. I looked at them when we were passing them by. She told the police that they pulled up and approached from behind, which was corroborated by another witness. That whole thing, she doesn't remember that correctly. Admittedly, admittedly, this person approached from behind, stayed behind to the side for the entire encounter. Mr. Baker, who was a large man, tipping the scales almost 300 pounds, was between them the entire time. It was a startling event. It took place in a matter of seconds. And most importantly, the only distinguishing feature that she indicated was that Mr. Pascal, the offender she described as Mr. Pascal, had a gap tooth, a unique identifier, a gap tooth, like a tattoo or a scar. All she could give was general height, black. Couldn't even give a clothing description at the time, but he's got that gap tooth. Now, Mr. Pascal had a gap tooth. We'd be talking a whole different thing. But he doesn't. It's not even in question. That's your sole eyewitness. Now, listen, it shouldn't have all fallen to her. She's related to the victim. I'm sure she loved the victim. She had all this pressure on her. But that doesn't change the fact that this whole thing took 30 seconds to a minute. She never saw this person before. And she showed that she was confused about the sequence as well as the descriptions on the guns. That went all over the place. She said she was focused on the gun, not on the offender's face. And on top of it, she said she described the van. It had that in different styles and different colors. You know the appellate record, and I know the standards. We know there are collateral minor things. You know, her attention was fixated on this man, okay? And she watched it. And her attention remained fixed on this fellow. Respectfully, I don't believe the record bears that out. The record I read does. Well, I know I'm losing battle, but I just want to – the record respectfully states that he approached from behind and she was looking out of the corner of her eye, that she was fixated on the gun, not the person, that Mr. Baker was in between, and that the only unique descriptor she gave was a gap tooth. I mean, I know that, you know, this is – at the end of the day, it's a single-finger case with a pumped-up identification. They did everything they could to pump up the photo array. They did everything they could to pump up the lineup. But both those things were unnecessarily poor. Well, let me ask you this. The jury thought this was convincing. I mean, how do we reverse this case? Well, Judge. When the jury found it convincing and, you know. I don't know how. I mean, I know the jury returned the verdict guilty after being – going out overnight, having 10 hours, asking for a number of transcripts, asking a number of questions. But this is the exact type of case where an appellate court from a cold record needs to step in and needs to look at the facts in a critical light to remove itself. When this – you know, the photo lineup took place, didn't she sign a form or was that before all those requirements? It was right before all those requirements. Oh, okay. And, you know, the photo lineup was one where Mr. Pascal was the only one with a different color background. For some reason, in a city that probably has 100,000 photographs of black men, they only come up with four additional fillers. Somehow they all – almost all had facial hair and Mr. Pascal had none. Then he goes in a lineup with two guys that are closer in complexion to me than him out of the five that were there, reducing it to a three-man lineup. What I'm saying is this is the kind of case where everyone wants to see a conviction because of the innocent victims. And the detectives know what they're doing. They know exactly what's a good lineup and what's a good photo array. And they bailed miserably on both of those, just enough to say it was there. And then the gap tooth. He's in the lineup. He doesn't have a gap tooth. She identifies William Pascal. What's the investigation? He had something of a matter with his mouth, didn't he? Overbite?  I think that after the prosecution realized, and I'm not casting any spurs with the prosecution, after they realized their gap tooth issue, heads were put together. What about Williams? What do you suggest – what did he get out of this? You mean in terms of coming in to testify? Yeah. Well, I think he was locked in. What did he get in exchange for his testimony? I'm not saying he was offered anything. Okay, well, what did he say at the jury trial? Did he indicate that he got something or he didn't get something or what? I don't believe he said he got anything. What was he brought in for? I want to say it was a domestic, but I'm not sure, Your Honor. Okay. So the jury heard this kid, okay? And now you're telling me that there really wasn't anything there to kind of destroy him. And he says that he's with the defendant and the defendant wants to sell a phone and they go to a phone store and they get $200 for the phone. He takes $50 and the defendant takes the rest. I mean, what was it that you're saying? The witness, you know, the victim, she gave her testimony. She identified him in a photo array two days after the murder. Then she said, I think she did say she wanted to see him in a physical lineup, didn't she? No. Okay. Then maybe I'm wrong. But she viewed an actual physical lineup later and picked him out. So I don't know how different he looked at the physical. But I want to hear about Kehwani Williams. What about him that suggests that he's just lying about this whole thing? Well, one, there was absolutely no corroboration of his testimony other than the fact that the phone was at the store. There was no receipts, no video, nothing that placed him there. You're not contesting that the phone was sold at that store? No. What I'm suggesting is the only one who's saying that he sold a phone for the defendant is Kehwani Williams. Right. And so that's my question. What about him suggests that there's enough here to reverse this conviction? What did the jury hear? Or what could we rest our head on to say, oh, this is just totally unbelievable? Well, one, I don't think it has to be said it's totally unbelievable to reverse this conviction based on testimony of the lack of solid evidence. Well, any rational trier of fact, okay? And he's part of the picture. So I'm just asking, what do you think is really bad about him? Well, what came out that you say suggests that a rational trier of fact couldn't believe that with the other evidence to come up with a verdict? He was in custody when he said it. He was ducking the detectives a number of times, five, six, seven times. Okay. He's never the his girlfriend, who was allegedly in a car, didn't say Mr. Pascal was there. No one said, except for Kehwani Williams, that this sold person was, that the defendant was with him, that the defendant gave him the phone. Okay. I mean, well, I would also indicate that Kehwani Williams has the same height, complexion, and facial structure as the defendant, and that was given to the jury as well. Okay. You've answered my question. Your time is up. Do you want to save some time for rebuttal? Sure, Judge. Thank you. Justice, I'm sorry. Okay. Let's hear it from the State. Good morning, Your Honors. Again, Assistant State's Attorney Whitney Bond, on behalf of the people. May it please the Court. I think what we've discussed so far today is the issue of reasonable doubt, and what the trier of fact was given in order to make the finding that this defendant was guilty, beyond reasonable doubt. The people submitted the testimony of Dominique Baker, who did give a very specific as to the details of who this defendant was, 5'6", a 5'7", a black male, short hair, dark complexion, eventually it was borne out that he was wearing a white T-shirt. In the lens of the Biggers factors, we have her opportunity to view him. This defendant was close to Dominique and Kevin. I think at one point she stated that he was no more than four feet away, and his face was uncovered. In terms of his face, we do have this issue of she first initially said this is a gapped tooth person, and then later after she identified him in the lineup, she pointed out that that's not a gapped tooth. There's something significant with his mouth, and later termed it an overbite. Obviously, they're two very different things because of our common sense. Now, we know what an overbite is, and we know what a gapped tooth is, but it's possible that just at the time, Dominique, that might not have been in her particular wheelhouse. All she noted was that there was something different about this defendant's mouth, and I think she even noted that again when she saw him at the lineup, and the lineup bore that out. Her attention at the time of the crime, they were the only ones in the street. She noticed a red Astro minivan that was eventually tied to Kevin Porter, who was also a, excuse me, a compatriot with the defendant. Again, going back to the accurate description she gave, and she was certain of her ID at the lineup. To answer your question, Justice McBride, she was shown a total of three photo arrays. The first photo array, she did not recognize anybody. She specifically said, and after she signed an advisory form, knowing that she did not have to identify anybody, that. So those were in place. They were in place. Oh, all right. That's what I thought. And so then after that, she, the detectives through dogged police work, that specifically on the issue of the warrantless arrest and the probable cause, the trial court went through very meticulously in this record to talk about, you know, if it was a statement from Antonio Johnson alone or a identification in a photo array alone, or, you know, or there's a van that we found that might be part of this robbery. He took all of those into consideration and said, you know, all of these together are pieces of a puzzle that, you know, form that basis of probable cause. But as it related to the photo array that was part of that probable cause puzzle, she, the second one, she identified the defendant, and using what the trial court termed best practices, where they flip, detectives flip a photo over one at a time, it was the second photo that he flipped over, and she immediately said, I believe, and I don't want to misquote her, she immediately said, I recognize him as the guy that took my phone from me, but I would have to see him in person to be sure. And I think what's important about that is that we recognize the entirety of this record. Dominique is an extremely specific and careful person. She makes specific points about what she saw she denies, either telling Detective Garza that, you know, a van pulled up and people jumped out. Her testimony and generally her statements have remained the same, and I think that's important when you're talking about, as, you know, counsels pointed out, this is a one-finger identification. She could have easily just wanted to pick somebody out, but she didn't. She wanted to make sure because she knows that identifying this person who killed her cousin is important to her and important to him and important to the courts. So she takes her time. She tells the, I would like to see him in person. They put together a photo lineup. In terms of the suggestiveness, excuse me, they put together an in-person lineup, and in terms of the suggestiveness of that, the people would submit there was none there either. They were all seated to account for any height discrepancies. The trial court, again, said that, you know, it was one of the best fillers of lineups that he had ever seen and that they had forms for this identification as well. They did, and it was pretty good. It's as good as it gets. I do note that counsel was saying that the two of the five men had facial hair or didn't have facial hair. I couldn't find anything in the record. It was all due to respect. I have much respect for counsel. I think it's dark complexion that to the trial court pointed to, two of the five have lighter skin than three of the five, the remainder of the three, which would include defendant. But again, he said, even down to the clothing, it's one of the best terms that he's ever seen. As for Colleen Williams, I think what's interesting to point out to this court is that a lot of these facts that he was testifying to were – could be construed as inconsistent in terms of what he – the handwritten statement that he made to ASA – or worked with with ASA Condon, he had made mention that defendant had asked him to sell a phone with a gold case. And then at trial, he testified that it wasn't a phone with a case. It was a gold case. In his statement, he says that he's never been offered anything for that statement. Yes. And then at trial, he says, the detectives offered me help on the case that I was arrested on. So in terms of what the people offered him his testimony for, we specifically – we being ASA in closing arguments – specifically literally told the jury that it was up to them to determine the credibility of Colleen. And the jury had the opportunity to determine the weight of the things that Colleen didn't really want to say. I think there was some instances of maybe trying to inject some inconsistencies because this defendant was his friend. And at the time he's talking about selling a phone, he doesn't know the importance of the phone during the handwritten statement. But by the trial, he does. It's connecting him overall to that robbery. And then on that point, too, the trial court – when it – the jury specifically asked for Colleen's handwritten statement. And the trial court was very specific, again, in his record, that he was very concerned about the defendant's case and found that his concern was that the defense made a big deal about that statement and he didn't want to deprive the jury of leaning on it and judging the weight of it. And he did redact four consistent portions of the evidence. So he did the best he could in order to balance the scales. That is all I have. If anybody has any questions, I'm happy to answer. Thank you. Briefly. In terms of, you know, Williams, going back to your Honor's question, he did say that he was offered help at trial. In terms of the importance of the phone, there's a huge difference between being there and receiving the phone and being with the phone after the fact. And in terms of the other points that I've made, there's a huge difference between being there and being there.  And there's a huge difference between being there and receiving the phone.  The second doesn't put Mr. Paschle in any criminal liability. She admitted that. Asked her straight out, do you have any explanation as to why? He said, to be honest, she had none. Asked her straight out, you know, Ms. Bond talks about how she was consistent throughout. That's not true. Wasn't she making the point that she saw something distinctive at the time? I mean, she wasn't going to spend, and she's being held up. She's going to notice something, but she's probably not going to fix it on exactly what's... I mean, wouldn't that be a common sense explanation for why that happened? And if not, what's your explanation? I think she said gap tooth. No, no, I'm not saying she didn't say gap tooth originally. But I think the State would say that this was happening fast. She got a look at him. She's probably not going to spend a lot of time focusing on exactly what's going on with his mouth, other than there's something a little unusual and unique. When she sees his photograph in the photo array, she immediately says that, I think that's the guy. She says, well, there was something about his mouth. I guess it wasn't a gap tooth. Is it unreasonable that that could have been exactly what happened? And if it's not unreasonable, what is your theory? Did she just pick this guy to pick somebody? No, absolutely not. Okay, well, then I want to hear it. I think she believes it. But she identified the one thing as a gap tooth. Sure. And, I mean, mean what you say, say what you mean. A communications major, all the more important. Yeah. The idea that, you know, all those points she led that question with you, Mr. Justice, about how it was quick, how it was this, how it was that, those are all points that show the identification is not the most reliable in the world. Didn't she confirm her physical identification of him at the lineup and didn't she make comments about the fact about the gap tooth? She confirmed that he was the person that robbed and shot. So didn't she confirm that she had a chance to see the physical lineup and knowing that he didn't have a gap tooth, she identified him? I think it was after the fact she found out they didn't have a gap tooth when he opened. Well, she said he was asked to open his mouth. The detective denied that. But at that point, it's the only picture with him with a. . . Right. But she explained that, didn't she? She made the identification after he. . . I asked you about the forms, remember, earlier today? Yes, sir. Did you try this case? I did. Okay. You told me there were no forms used. I mean, I don't know if you tried it or not. If you didn't, that's fine. No, I did try the case. Now I asked you about the lineup. That's all. I asked you if she explained in a way that the gap tooth was not correct and she positively identified him. That's all. That's all I was getting at. Yes, she did. And it doesn't change initial identification. And I apologize if there are. . . In the photo lineup, is there any evidence of a gap tooth? No. Okay. So then it wasn't really an issue at that point. I said absolutely it is. No, because she had viewed other photo arrays and she didn't pick anybody out. In the photo array where he. . . It's not showing. Is it not showing in the photo array? It's not showing. Maybe it shouldn't have been an issue in the photo array, but it certainly should have been an issue when he was arrested. And the detectives could see he had no gap tooth. And it certainly should have been a factor in probable cause to determine whether or not he should be arrested and placed in the lineup. But that wasn't done. And I apologize if I may have gotten the forms wrong. I'll tell you this. That major identification reforms were enacted about three or four months later. Besides the statute I put in my brief. If there was one form on an earlier version. . . But did you do the motion to suppress the. . . I did not. Okay. But you tried the case, you said. I did. Oh, okay. All right. We don't need to dwell on it. She explained. You've explained. And I know that if I could just touch on two more points. One is this idea that the lineup was. . . The photo array was good. The judge, Judge Wilson, used a ton of extrajudicial information to determine it. Talking about how he did seminars, how he done best practices. You know, that's totally improper. He can't just come in and say. . . Hey, guys, I got all this information from a source outside this hearing. And I'm going to use it to help decide the case. When he's deciding. . . Not before. Not, I'd like to hear about this. And the standard of review on that is that it had any weight. At the end of the day. . . The photo array, the lineup were not good. The probable cause, not good. At every stage, everyone is trying to kind of push this through. Because the type of victim. . . And it was a horrific crime. You had a single finger with scant corroboration. Who was repeatedly impeached. Got the sequence of events wrong. Came up with some things. . . Six, eight months after the trial. That were key facts. These are all things that the jury heard. And they were all things that this Court needs to take a close look at. From the cold perspective of a record. Not be swayed by the same emotion. And to look and to see whether this scant evidence. . . Is enough to push someone away for the rest of their lives. Thank you. Thank you, Judge. Thank you for giving us an interesting case. And good arguments and good briefs. And you'll have a decision shortly. And the Court will be adjourned.